IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2024

**IN RE DESTINEY J., ET AL.**

**Appeal from the Claiborne County Juvenile Court**
**No. 2019-JV-2367   Robert M. Estep, Judge**

_____

**No. E2024-00136-COA-R3-PT**
_____

In this parental termination case, the father appeals the termination of his parental rights to his three children. The trial court found that two grounds for termination had been proven and that termination of the father's parental rights was in the children's best interests. Based on these findings, the court terminated the father's parental rights. The father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Jordan Long, Tazewell, Tennessee, for the appellant, Ronald L. J., Jr.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Noah J. Patton, Tazewell, Tennessee, Guardian ad litem.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

Ronald L. J., Jr., ("Father") and Tonya M. C. ("Mother") are the parents of Destiney D. J., born in November 2014, Abagail D. J., born in November 2015, and Ronald L. J., III, born in February 2019 (collectively, the "Children").

---

[1] This court has a policy of protecting the identity of children by initializing the last names of the children, parents, close relatives, and pre-adoptive parents and by not providing the children's exact birth dates.

On March 6, 2023, the Department of Children's Services ("DCS") filed a petition in the Claiborne County Juvenile Court to terminate the parental rights of both parents. The juvenile court conducted a trial on November 20, 2023. In a written order entered on January 3, 2024, the court terminated the parental rights of both parents. Regarding Father, the juvenile court found that DCS had proven the grounds of (1) abandonment by failure to visit and (2) substantial noncompliance with the permanency plans. The court also found that termination of Father's rights was in the Children's best interests. On January 29, 2024, Father timely filed his notice of appeal. Because Mother has not appealed the trial court's decision, our focus will be on issues germane to Father's appeal.

DCS' involvement with this family began in 2019, in the first dependency and neglect proceeding, when the juvenile court issued a no-contact order between Mother and the Children due to Mother exposing the Children to illicit substances.[2] Thereafter, in May 2019, the juvenile court removed the Children from Father's custody after he violated the no-contact order by allowing Mother to reside with the Children.

Father regained custody of the Children in December 2020; nevertheless, and importantly, the no-contact order involving Mother and the Children remained in effect.[3]

A second dependency and neglect proceeding ensued after DCS received a referral for improper supervision because Father was allegedly violating the no-contact order between Mother and the Children, and allegations that Father physically abused and improperly supervised the Children. The report was received on January 24, 2022. That afternoon, a Child Protective Services ("CPS") investigator interviewed a staff member at Destiney and Abagail's school. The staff member informed the investigator that Destiney had a black eye, and that Destiney disclosed that Father had hit her. It was also reported that Abagail had told the staff member that she lived with Mother and Father. Later that day, the CPS investigator went to inspect Father's home, but no one answered the door.

---

[2] As Judge Estep stated in more detail in his final order in this termination proceeding:

The Court would note that the children were removed into foster care prior to the dependency and neglect action that gave rise to this Petition. Specifically, [Mother] was ordered to have no contact with the children pursuant to an Adjudicatory and Severe Abuse Hearing Order entered on July 10, 2019, in which the Court found that [Mother] tested positive for methamphetamine and marijuana during the birth of Ronald [III], and that the child also tested positive for methamphetamine and marijuana. Therefore, the Court found by clear and convincing evidence that [Mother] knowingly used drugs while pregnant despite the risk of harm of in utero drug exposure to the child.

[3] As Judge Estep explained in his final order in this termination proceeding:

[Father] successfully completed permanency plan and trial home placement and regained custody of the children on December 9, 2020. [Mother] did not complete her permanency plan and did not attend the hearing. Therefore, the No Contact Order remained in effect.

The next day, that being January 25, 2022, the CPS investigator returned to the Children's school and spoke with Destiney and Abagail. Destiney reported that she, along with Abagail and her brother, Ronald III, lived with Father and Mother. Destiney also stated that Mother cared for Ronald III while Father was at work. Abagail reported the same information. The CPS investigator then went back to Father's home. After Mother answered the door with Ronald III, Mother informed the investigator that she moved back into the home upon her release from jail, explaining that she believed the no-contact order was no longer in effect because she was no longer on probation. Father returned to the home while the CPS investigator was still at the home, at which time Father acknowledged the existence of the no-contact order but explained that he had to violate the order because his childcare provider was sick. Father also denied that Mother lived in the home, but he was unaware where Mother lived.

Later that day, the juvenile court found that there was probable cause that the Children were dependent and neglected because Father knowingly violated the no-contact order by allowing Mother to care for the Children, awarded DCS temporary legal custody, and granted Father supervised visitation. The order, entered on February 1, 2022, also recited that the court found that DCS had made reasonable efforts to prevent the Children's removal from the home.[4] DCS subsequently placed the Children in two separate foster homes with Destiney in one, and Abagail and Ronald III in another.

On August 24, 2022, the juvenile court adjudicated the Children dependent and neglected, while DCS retained custody of the Children, and Father's visitation with the Children was modified to therapeutic visitation.

The first family permanency plan, which was created on August 16, 2022, and later ratified by the court on October 26, 2022, required Father to:

1.  Participate in a mental health assessment and follow any recommendations,
2.  Complete an alcohol and drug assessment and follow any recommendations,
3.  Obtain education and provide documentation regarding the exposure of the Children to persons under the influence of substances,
4.  Submit to and pass random drug screens,
5.  Follow all laws, including any court orders such as the no-contact order between the Children and Mother,

---

[4] The February 1, 2022 order explained that the Children were removed from Father's custody pursuant to a petition to transfer temporary legal custody filed by DCS, after the court found probable cause that Father had violated a prior court order by allowing the Children to have unsupervised contact with Mother.

6. Make anyone over the age of 18 who resides in the home or stays in the home overnight available for drug screens and background checks,

7. Ensure that Mother is not staying or living in the home unless the no-contact order is lifted,

8. Submit to random home checks,

9. Provide documentation of his license, insurance, and registration to DCS,

10. Cooperate with therapeutic visitation and schedule visits with the Children at least twice a month, and

11. Confirm visits 24 hours in advance and be responsible for his own transportation to visits.

The permanency plan was amended on February 14, 2023, and ratified on April 26, 2023, with the same requirements as the first except for one additional component, that Father complete anger management classes. The ratification order also included a finding that Father was not in substantial compliance with the permanency plan because he refused to maintain contact with DCS.

In the months that followed, Father completed some of the permanency plan requirements; however, he did not complete all of them. He also had intermittent and confrontational communications with DCS staff and the service providers retained by DCS, and he had few visits or phone calls with the Children. For these and other reasons, which are discussed in detail below, on March 6, 2023, DCS commenced this action to terminate Father's parental rights. The case was tried on November 20, 2023, before Judge Robert Estep of the Juvenile Court for Claiborne County, Tennessee. Those participating in the trial included Christina Lawson, DCS' attorney; Diana Bentley, a DCS case manager; Mystic Whitson, a Youth Villages worker and in-home therapist; Victoria H., the foster mother of Abagail and Ronald III; Elizabeth P., the foster mother of Destiney; Father and his attorney Jordan Long; Mother and her attorney, Dennis Bailey; and Noah Patton, the Guardian ad Litem.

In a written order entered on January 3, 2024, the court terminated Father's parental rights on the grounds of abandonment by failure to visit and substantial noncompliance with the permanency plans and the finding that termination of Father's rights was in the Children's best interests.[5] Some of the findings by the trial court, as stated in the final order, include:

> [DCS Case Manager] Bentley reported that [Father] visited only once on November 30, 2022, during the four (4) months prior to the filing of the Petition. The scheduled December visitation was cancelled by [Father].

---

[5] The court terminated Mother's parental rights on two grounds, substantial noncompliance with the permanency plan and severe child abuse, as well as the finding that termination of her parental rights was in the Children's best interests. As noted earlier, Mother did not appeal the termination of her parental rights.

Ms. [H., the foster mother for Abagail and Ronald III] testified that the children, Abagail and Ronald, III, visited [Father] once in November 2022. She reported that [Mother] never visited the children during the relevant lookback period. Ms. [H.] further stated that there were no telephone calls or other communication from either parent between November 2022 and the Spring of 2023.

Ms. [P., Destiney's foster mother,] reported that [Father] visited Destin[e]y once on November 17, 2022, during the relevant lookback period.

[Mother] testified that she was using drugs and unable to care for the children or herself during the four (4) months preceding the filing of the Petition. She could only recall that it had been a few years since she last saw the children.

[Father] asserted that his failure to visit was not willful and reported that he had an automobile [accident] in September 2022 and visited the children once following the accident. Furthermore, [Father] stated that he made several calls to Camelot [a visitation service provider retained by DCS] to request visitation with no response. He reported that he complained to DCS that he was unable to visit because the provider agency scheduled visitation during his work hours. [Father's] testimony relating to such actions is not clarified with any offering of specifics as to the times he attempted to make such telephone calls or other details of such attempts. He further failed to provide any evidence of his complaint to DCS other than his own statement that he had done so. The Court does not find [Father's] testimony credible, as he stated that he was unemployed following his car accident, and he also testified that he could not visit because the provider would not schedule visitation to accommodate his work hours.

CM Bentley testified that [Father] was unemployed during the months following his car accident, specifically between September 2022 and May 2023. She reported that [Father's] visitation schedule was changed to Fridays between 6:00 p.m. and 8:00 p.m. to accommodate his work schedule, but he still failed to visit the children.

This appeal by Father followed.[6]

### ISSUES

Father presents three issues for our review:

_____

[6] As noted earlier, Mother did not appeal the termination of her parental rights.

1. Did Father substantially comply with the requirements of his Family Permanency Plan?
2. Did Father abandon his children by willfully failing to visit between November 6, 2022, to March 5, 2023?
3. Is it in the Children's best interests for the parental rights of Father to be terminated?

## STANDARD OF REVIEW

Under both the United States and Tennessee constitutions, parents have a fundamental constitutional interest in the care and custody of their children. *In re Connor B.*, 603 S.W.3d 773, 778 (Tenn. Ct. App. 2020) (citing *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002)). However, parental rights are not absolute and may be terminated if there is clear and convincing evidence to justify such termination under the applicable statute. *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citations omitted).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Makendra E.*, No. W2015-01374-COA-R3-PT, 2016 WL 325481, at *2 (Tenn. Ct. App. Jan. 27, 2016) (citing *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

In light of this heightened standard of proof, we must "review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests[,]" *In re Connor B.*, 603 S.W.3d at 779 (quoting *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016)), and make our "own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d 586, 596–97 (Tenn. 2010)).

The trial court's findings of fact are reviewed de novo upon the record with a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). Questions of law, however, are reviewed de novo with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted).

## ANALYSIS

### I. GROUNDS

To terminate parental rights, a court must find that at least one statutory ground for termination has been proven by clear and convincing evidence. *In re Carrington H.*, 483 S.W.3d at 535 (citing Tenn. Code Ann. § 36-1-113(c)).

## A. Abandonment by Failure to Visit

The trial court found that Father abandoned the Children by failing to visit. *See* Tenn. Code Ann. § 36-1-113(g)(1). Abandonment occurs when a parent fails to visit his or her child "for a period of four (4) consecutive months immediately preceding" the filing of the termination petition.[7] Tenn. Code Ann. § 36-1-102(1)(A)(i).

Here, it is alleged that Father merely had token visitation with the Children during the relevant period, the four-month period immediately preceding the filing of the termination petition. Visitation must be more than "token," *see* Tenn. Code Ann. § 36-1-102(1)(E), which is defined as "visitation [that], under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

In response to a termination petition alleging abandonment, a parent may assert a lack of willfulness as an affirmative defense. Tenn. Code Ann. § 36-l-102(1)(I). "The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." Tenn. Code Ann. § 36-1-102(1)(I). A parent who alleges that their abandonment was not willful "bear[s] the burden of proof that the failure to . . . support was not willful. Such defense must be established by a preponderance of evidence." *Id.*

Here, Father contends that his failure to visit the Children was not willful. Accordingly, in reviewing the question of willfulness regarding Father's failure to visit, we consider the matter of willfulness under the preponderance of the evidence standard, rather than under a clear and convincing standard.

---

[7] Tennessee Code Annotated § 36-1-102(1)(A)(i) defines "abandonment" and provides that parental rights may be terminated when:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

DCS filed the termination petition on March 6, 2023. The trial court correctly found that the relevant four-month period pursuant to the statute was November 6, 2022, through March 5, 2023, and found that Father only visited the Children on two occasions during that period, that his infrequent visits were merely token, and that he failed to prove by a preponderance of the evidence that his failure to visit was not willful. The court also found that his testimony on this issue was not credible.[8]

During the relevant four-month period, Father visited Destiney once, on November 17, 2022, and Abagail and Ronald III once, on November 30, 2022. The evidence in the record also proves that these visits were merely "token," as Father left each visit early. Father also cancelled a planned December 2022 visit and did not attempt to reschedule the visit.

As for his phone calls with the Children during the relevant four-month period, Father presented no evidence of the frequency or quality of those calls. Further, Father's few calls were infrequent, short, and of such a nature that the Children had no desire to talk to Father as of the time of trial.

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. . . . The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Leah T.*, No. M2022-00839-COA-R3-PT, 2023 WL 4131460, at *7 (Tenn. Ct. App. June 22, 2023) (quoting *In re Audrey S.*, 182 S.W.3d 838, 863–64 (Tenn. Ct. App. 2005)).

It is readily apparent that Father's one visit with Destiney on November 17, 2022, and his one visit with Abagail and Ronald III on November 30, 2022, were "token visitation" for the purposes of this ground. *See*, e.g., *In re Keri C.*, 384 S.W.3d 731, 750–51 (Tenn. Ct. App. 2010) (holding that, under the circumstances, the mother's once-a-

---

[8] "We accord great weight to a trial court's decisions regarding the credibility of the witnesses who have testified before it." *In re Audrey S.*, 182 S.W.3d 838, 867 (Tenn. Ct. App. 2005) (citations omitted).

month half-hour contacts with the child at large family gatherings cannot be viewed as a reasonable attempt to forge a meaningful relationship with the child).

Accordingly, we affirm the trial court's ruling regarding this ground.

### B. Substantial Noncompliance with Permanency Plan

Section 36-1-113(g)(2) of the Tennessee Code Annotated authorizes termination of parental rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan[.]" *In re Valentine*, 79 S.W.3d at 546.

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, . . . notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and related to remedying the conditions that necessitate foster care placement.

Tenn. Code Ann. § 37-2-403(a)(2)(C). Thus, a trial court presiding over the termination proceedings must find that the requirements of a permanency plan are "reasonable and related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). And as our Supreme Court held and explained in *In re Valentine*, "this finding must be made in conjunction with the determination of substantial noncompliance under § 36-1-113(g)(2)." *Id*. at 547. Here, the trial court made no findings regarding the reasonableness of Father's responsibilities under the permanency plans. Thus, as *Valentine* instructs, our review of this issue is de novo. *Id*.

"Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *Id*. The Children were removed from Father's custody principally because he allowed Mother to live in his home with the Children in violation of the no-contact order, and the no-contact order was entered because Mother exposed the Children, particularly Ronald III, to illicit drugs.

Father was required to complete an alcohol and drug assessment and follow all recommendations, complete a mental health assessment, and follow all recommendations, submit to random drug screens, obtain and maintain safe and suitable housing, obtain a legal source of income, obtain a reliable transportation plan, comply with all court orders, attend AL-ANON meetings or other type of education classes regarding exposing the Children to individuals with substance abuse addiction, and attend regularly scheduled visits with the Children. Because conditions necessitating foster care placement may include conditions related both to the Children's removal *and to family reunification*, *see*

*id.*, we conclude that all the requirements were reasonable and related to remedying the conditions that necessitated foster care placement in this case.

We now turn our attention to whether Father was in substantial noncompliance with the requirements of the permanency plans. After making findings of fact regarding Mother, the trial court set forth the following regarding Father:

> [Father] reported that he completed a mental health assessment and was diagnosed with bipolar disorder. He advised that [ ]he sees Dr. Lucas once per month. [Father] reported that he failed to submit for random drug screens requested by DCS due to his work hours; however, he maintained that he did not have a substance abuse problem. He advised that he still lives at the residence in which the children were removed. While he reported that the children still have their bedrooms in the home, the home needs repairs and would be ready for the children to return to in December 2023. [Father] testified that he is employed at a landscaping company and earns $13.00 per hour.
>
> CM Bentley testified that attempts to inspect [Father's] home were unsuccessful due to his refusal to allow her in his home. She advised that [Father] failed to respond to numerous phone calls and text messages and confirmed that he failed to report for random drug screens.
>
> [Father] failed to provide any proof that he completed his mental health assessment, alcohol and drug assessment, and parenting education classes, and the Court cannot speculate as to whether [Father] completed such necessary steps such that it would be safe for the children to return to his home.

Father contends that he completed most of the requirements of his permanency plan and was making progress on the requirements that he had not completed. In his brief he relies on the testimony of Ms. Bentley, the DCS case manager, who admitted at trial that Father had completed the alcohol and drug assessments, the mental health assessment, and the parenting education classes. However, his housing was not in a suitable condition for the Children to reside there. Further, while Ms. Bentley acknowledged that Father did not fail a single drug test, she noted that he was a no-show on numerous requested random drug tests, allegedly because it conflicted with his work; however, there was unreliable proof that he was employed when the tests were requested. In fact, the only proof of employment was for the period since May 2023. It was also established that Father did not have transportation, or a driver's license, until shortly before trial.

As DCS notes, some of the responsibilities that Father completed were belatedly accomplished. Father completed an alcohol and drug assessment and mental health

assessment in February 2023, which was more than a year after the Children's removal and only one month before the termination petition was filed. Whether Father maintained employment is disputed at best, for Father claims to have acquired employment in May 2023, two months after the petition was filed; yet he never provided proof of employment to DCS. Father also did not complete parenting education classes until late September 2023, which was six months after the petition was filed and just two months before trial, and Father did not acquire a valid driver's license until two weeks before trial.

Also significant, Father stopped answering calls from DCS after October 2023 because he later claimed to be "busy." Father admitted at trial that he would not allow DCS to visit the home and that the home remained unsuitable for the Children "due to remodeling." And as discussed in detail earlier, Father abandoned the Children by failing to visit the Children. During the custodial period, which lasted twenty-one months, Father only had four or five in-person visits, and he failed to visit the Children, except for two visits, over the relevant four-month period preceding the filing of this action.[9] He also failed to have meaningful telephone calls with them. Father blamed DCS and its contract service providers, Camelot and Youth Villages, and his purported work schedule for failing to visit the Children; however, he provided no credible excuse for failing to visit the Children. The record reveals that Father successfully scheduled but then canceled visits, and visits were moved to accommodate Father's work schedule. Moreover, and significantly, the trial court found Father was not credible; thus, his claimed excuses carry little weight. *See In re Audrey S.*, 182 S.W.3d at 867 ("We accord great weight to a trial court's decisions regarding the credibility of the witnesses who have testified before it.").

For the foregoing reasons, we affirm the trial court's finding that DCS proved the ground of substantial noncompliance.

## II.     THE CHILDREN'S BEST INTERESTS

Once a court has found a parent to be unfit based on clear and convincing evidence of one or more grounds for termination, the interests of parent and child diverge. *In re Jude M.*, 619 S.W.3d 224, 244 (Tenn. Ct. App. 2020) (citations omitted). "While the parent's interests do not evaporate upon a finding of unfitness, the focus of the proceedings shifts to the best interests of the child." *In re Audrey S.*, 182 S.W.3d at 877 (citations omitted).

"Facts considered in the best interests analysis must be proven by 'a preponderance of the evidence, not by clear and convincing evidence.'" *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citations omitted). After a court makes its factual findings regarding the relevant best interest factors, it must consider the combined weight of the best interest factors to determine whether they amount to clear and convincing evidence that termination

---

[9] Ms. Bentley, the DCS case manager, testified that Father visited one time between November 6, 2022, and March 5, 2023.

is in the Children's best interests. *See id.*; *see also In re Kaliyah S.*, 455 S.W.3d 533, 555–56 (Tenn. 2015).

In determining whether termination of parental rights is in a child's best interest, courts must consider the non-exhaustive list of statutory factors in Tennessee Code Annotated § 36-1-113(i)(1). *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). These statutory factors are not exclusive, and courts are free to consider any other proof offered at a termination proceeding that is relevant to the best interest analysis. *In re Neveah M.*, 614 S.W.3d 659, 679 (Tenn. 2020) (citations omitted).

The trial court made extensive findings and conclusions regarding the best interest factors set forth in Tennessee Code Annotated § 36-1-113(i)(1).[10] The trial court found that

---

[10] Tennessee Code Annotated § 36-1-113(i)(1)(A)–(T) includes the following factors for consideration in determining whether termination of parental rights is in the best interest of the child:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;
> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
> (H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
> (I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
> (J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;
> (K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct or conditions;
> (L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;
> (M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

each factor weighed in favor of terminating Father's parental rights except for factor (O) and (S), which the court found not to apply. Having reviewed the evidence in the record, we find that the evidence preponderates in favor of the trial court's findings as to each of these factors, some of which we discuss below.

Regarding factor (A), which pertains to stability and continuity of placement, the trial court found that the Children have continuously been in foster care since January 2022, that the foster mothers testified that the Children are well adjusted and feel safe in their homes, and that the foster mothers hope to adopt the Children.

Regarding factor (B), which pertains to the effect a change of caretakers would have on the Children's emotional, psychological, and medical conditions, the court found that both foster mothers reported that the Children become upset and angry after having contact with Father, and that the Children get angry with him for being a "no-show" for visits or phone calls. The court also noted that Youth Villages case manager Whitson testified that Father's phone calls were often met with silence by the Children, that the Children do not have a meaningful relationship with Father, and that their behaviors deteriorate after contact with him. The court also noted that Ronald III has "meltdowns at school" and has stated that he "hates" Father. CM Whitson also testified that Abagail tends to avoid confrontation but exhibits her frustration through slamming doors and struggles with feelings of rejection and that Destiney no longer participates in visits or phone calls with Father.

Skipping to factor (D), the court found:

The evidence is clear that the attachment between the parents and the children has significantly deteriorated since January 2022. [Father's] inconsistent contact created feelings of rejection in the children. Conversely, the children

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;
(O) Whether the parent has ever provided safe and stable care for the child or any other child;
(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;
(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;
(R) Whether the physical environment of the parent's home is healthy and safe for the child;
(S) Whether the parent has consistently provided more than token financial support for the child; and
(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

- 13 -

have bonded to their respective foster families, and their needs are met by their foster parents.

Regarding factors (F) and (G), the trial court noted that the Children exhibit behaviors after contact with Father and have repeatedly told case manager Whitson that they are afraid of returning to Father's home.

As for factors (H) and (I), the trial court noted that the foster mothers testified that the Children are well adjusted in their respective homes, and they refer to their foster parents as "Mom" and "Dad." Also, the foster mothers testified that the Children are attached to their families and siblings. Further, the foster parents live near each other, which has allowed the Children to maintain their relationship with each other. These relationships have provided significant comfort and safety to the Children in the absence of their parents.

Skipping to factor (P), the trial court found that Father has not maintained consistent contact with the Children during the custodial episode.

As for factors (Q) and (R), the court noted that Father's home is not safe for the Children to return to, and Father refused to allow DCS to enter his home.

Regarding factor (T), which pertains to the mental or emotional fitness of the parent and whether it would be detrimental to the Children or prevent the parent from consistently and effectively providing safe and stable care and supervision of the Children, the court noted that Father was required to submit to mental health assessments and follow recommendations as part of their permanency plan, but no proof of completion was ever provided to the court or DCS. Father testified that he completed his mental health assessment and was diagnosed with bipolar disorder. He failed to provide the Court with documentation from his provider of the treatment necessary to assure that Father is mentally or emotionally fit to parent the Children. The court went on finding:

> Such mental and emotional unfitness causes concern to the Court of the ability of both parents to recognize the safety needs for these children. They do not seem to understand the necessity that children live in a safe home free of drugs and abuse.

> The children are living in safe and stable homes with their respective foster families and to remove them from these homes and return them to the parents based on the testimony provided would constitute further abuse to the children.

Based on the above and other findings, the trial court found "by clear and convincing evidence that it is in the best interest of the child[ren] that the parental rights of [Mother] and [Father] be terminated."

- 14 -

Having reviewed the record, we find that the evidence preponderates in favor of each of the trial court's best interest findings, including other findings we did not discuss above.

As stated above, after a court makes its factual findings regarding the relevant best interest factors, it must then determine whether the combined weight of the best interest factors amount to clear and convincing evidence that termination is in the child's best interests. *In re Carrington H.*, 483 S.W.3d at 535; *see also In re Kaliyah S.*, 455 S.W.3d at 555–56.

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis."

*In re Gabriella D.*, 531 S.W.3d at 682 (quoting *In re Audrey S.*, 182 S.W.3d at 878) (citations omitted).

Here, the trial court found that Petitioners had proven by clear and convincing evidence that termination of Father's parental rights was in the Children's best interests. Based upon our review of the record and our consideration of the relevant best interest factors as found by the trial court, we agree that the combined weight of the relevant factors amount to clear and convincing evidence that termination of Father's parental rights is in the best interests of the Children. *In re Carrington H.*, 483 S.W.3d at 535; *see also In re Kaliyah S.*, 455 S.W.3d at 555–56.

Accordingly, we affirm the trial court's determination that termination of Father's parental rights is in the Children's best interests.

Because we have affirmed the trial court's determination that a ground for termination of Father's parental rights has been proven and that termination of Father's parental rights is in the Children's best interests, we affirm the termination of Father's parental rights to the Children.

**CONCLUSION**

For the reasons stated above, we affirm the termination of Father's parental rights to Destiney, Abagail, and Ronald III. Costs of appeal are assessed against the appellant, Ronald L. J.

_____
FRANK G. CLEMENT JR., P.J., M.S.